This is a vehicular homicide case. The appellant was indicted under Ala. Code § 13A-6-2 (Supp. 1977) for causing the death of another person while recklessly engaging in conduct which created a grave risk of death to a person other than himself under circumstances manifesting extreme indifference to human life. The appellant was charged specifically with causing the death of Robert Forgey, Jr. by his operation of a motor vehicle while under the influence of intoxicating liquors or narcotic drugs. The appellant was convicted of the lesser included offense of manslaughter and the trial court fixed his punishment at eight years' imprisonment in the State penitentiary.
The sufficiency of the State's evidence is not challenged on this appeal. Without narrating the evidence in detail, it appears that at approximately 9:00 p.m. on June 25, 1981, Huntsville police officers received a "fight call" and proceeded to 115-B Longwood Court in Huntsville to answer the disturbance. (R. 11, 36, 101) Arriving at that location the police officers saw appellant running to his Pontiac automobile carrying his two and one-half month old son in his arms. Appellant left at a high rate of speed, "throwing gravel all over the parking lot," and passed one of the officers in the process. (R. 36, 101)
The officers lost sight of appellant's Pontiac but followed the direction he had taken on Gallatin Street toward the Huntsville Hospital. Running red lights along the way, appellant continued driving at a high rate of speed until his Pontiac collided with a Datsun B-210 at the intersection of Gallatin Street and Saint Clair. The Datsun was attempting to turn from Saint Clair onto Gallatin at the moment of impact. The Datsun was occupied by Brett Smith, the driver, and his friends Jimmy Strickland and Bob Forgey, the victim. The victim was taken to Huntsville Hospital and placed in intensive care, but died later as a result of the head injuries he had received.
All three of the young men had been drinking beer prior to the fatal collision; however, Smith testified that his driving ability had not been impaired from the *Page 975 
amount of alcohol he had consumed. Both Smith and Strickland were certain that the traffic light in their turn lane on Saint Clair was green when appellant hit them. Another witness, Mark Taylor, who was unavailable to testify at appellant's trial, but who had earlier testified at the preliminary hearing, confirmed that appellant "ran the red light" at the time of impact. (R. 162)
Appellant's Pontiac traveled through the intersection about one hundred feet after the collision and appellant was seen exiting the car, infant in arms, running toward the Huntsville Hospital Emergency Room. Officer Ivan Fello entered the emergency room a "few seconds" after appellant. (R. 15) According to Officer Fello, appellant "was hollering; he wanted help for his baby, said his baby had been hurt." (R. 15) It was determined that appellant's infant son was not very seriously injured.
Officer Fello described appellant as being "highly intoxicated" "[T]here was a strong odor of alcoholic beverages on his breath. He was boisterous, loud and his speech was slurred to a degree." (R. 17) Officer Fello continued to stay with appellant at the hospital until he was placed under arrest one and a half to two hours later.
Other Huntsville police officers, as well as registered nurse Martha McKelvey, also saw appellant in the emergency room and testified that he was "intoxicated." (R. 43, 106, 114). "[H]is eyes were bloodshot, his speech was slurred and there was a strong odor that appeared to be an alcoholic beverage on his breath." (R. 43) "His condition, he had the smell of alcohol on his breath and he also was acting like he was addled. I don't know if it was from the accident or whatever and he didn't act too concerned about the accident itself." (R. 106) Laboratory analysis revealed that the ethyl alcohol content in appellant's blood over an hour after the collision was .19 percent.
Appellant testified in his own behalf that on the evening in question he and his wife had had a "disagreement" and that as he had "assisted her to sit down" they both fell onto the couch where the baby was lying. (R. 174, 178) Fearing that his infant son had been injured, appellant "calmly left the parking lot" headed for the hospital "at a slow rate of speed." (R. 179) Appellant maintained that he had consumed "two or three beers" prior to driving to the hospital and that he tried "to miss the vehicle (Datsun) but I couldn't . . . because it was coming too fast." (R. 175, 176)
 I
During the time Officer Fello was present in the emergency room with appellant, one of the doctors advised Fello that the victim involved in the collision was "slowly dying." (R. 33) Officer Fello testified, over objection, that when he related this information to appellant "the man smiled." (R. 33) Appellant maintains that it was reversible error in violation of his Fifth Amendment privilege against self-incrimination to admit evidence of his facial expression. Relying on Schmerberv. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908
(1966)[1], appellant contends that Officer Fello's "communication" amounted to a custodial interrogation which required that the Miranda warnings be given. We disagree.
Assuming that appellant was in custody at the time Officer Fello related to him the information about the victim from the doctor, as he alleges, the Supreme Court of the United States in Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682,64 L.Ed.2d 297 (1980), makes it clear that the special procedural safeguards outlined in Miranda are not required simply where a suspect is taken into custody, but where a suspect in custody is subjected to interrogation. *Page 976 
"`Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S., at 300,100 S.Ct. at 1689, 64 L.Ed.2d, at 307.
As the Supreme Court stated in Miranda v. Arizona,384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966): "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The Court in Innis concluded that:
 "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S., at 300-301, 100 S.Ct. at 1689-1690, 64 L.Ed.2d, at 307-308.
Applying the foregoing principles of law to the facts in this case it is clear that appellant was not "interrogated" within the meaning of Miranda. He was not subjected to express questioning, nor can it fairly be said that he was subjected to the "functional equivalent" of questioning. Bedingfield v.State, 47 Ala. App. 677, 260 So.2d 408 (1972) and authorities cited therein.
Given the fact that the entire "conversation" consisted of one statement by Officer Fello, we cannot say that the officer should have known that it was reasonably likely that appellant would so respond. As in Innis, this is not a case where police officers carried on a lengthy harangue in the presence of the suspect. Nor does the record support appellant's contention that, under the circumstances, Officer Fello's comment was particularly evocative. In our opinion, the statement made by Officer Fello did not even reach the level of "subtle compulsion," which the Court in Innis held could not be equated with "interrogation." 446 U.S., at 303, 100 S.Ct. at 1690,1691, 64 L.Ed.2d, at 309.
While the fact that appellant "smiled" upon being informed that the victim was "slowly dying" may have given the jury the impression that appellant was callous in his concern for the victim, it cannot be said that Officer Fello could have reasonably anticipated this response. Appellant's "smile" could just as easily have been seen as a further demonstration of his degree of intoxication, rather than his unconcern. Be that as it may, we do not find that appellant's Fifth Amendment privilege against self-incrimination was violated in this instance.
 II
We have carefully reviewed appellant's contention that the prosecution did not exercise good faith in attempting to locate the unavailable witness, Mark Taylor, an eye-witness to the collision, and have found it to be without merit. It is clear that the requisites set out in Anderson v. State,362 So.2d 1296, 1301 (Ala.Cr.App. 1978) for the introduction of Taylor's preliminary hearing testimony were met. Before Taylor's preliminary hearing testimony was read into evidence, the trial court conducted a voir dire hearing to determine what attempts had been made to locate the witness and have him available for trial.
Larry Smith, an investigator for the District Attorney of Madison County, listed the following steps he took in attempting to locate the witness Taylor for trial:
 "Q Could you detail for the Court, please, what steps you have taken in the attempt to locate Mr. Taylor?
 "A After the preliminary hearing and prior to the first time the trial was set, Mr. Taylor was staying with a friend here in Huntsville and prior to that trial I called up and was advised by that friend that Mr. Taylor had come in one afternoon, *Page 977 
packed his bags and left without leaving any forwarding address or place where he could be reached.
 "I continued to check to see if that was still true and it was. I called — Mr. Taylor had domestic relations cases in Birmingham and I called the Department of Pensions and Security in Birmingham, obtained two numbers of relatives in Mississippi and Georgia and called them and they had not seen or heard from Mr. Taylor. In addition, as late as last Thursday, I called the friend he was staying with and he said that the last time he had seen or heard from Mr. Taylor was sometime last Fall when he came in and packed his bags and left.
 "Mr. Taylor advised us that he was a carpenter. I tried unsuccessfully to contact people at the carpenter's union hall to see if he had left for any jobs but I couldn't find anyone to answer my questions there.
 "Q Are you aware, in your employment with the District Attorney's Office, that Mr. Taylor has pending child support cases in our office?
"A He does.
 "Q Did you make an investigation as to whether or not they had been able to locate him?
 "A I did, and the child support investigator advised me he had not been seen for a period consistent with about the last three months. Also, I checked NCIC and with what information I had and nothing came back.
 "Q Are you aware of any forwarding address, or any other addresses by which you could come into contact with Mr. Taylor?
"A None whatsoever.
 "Q Have you made contact with every one of his known relatives that you could reach in the State of Alabama and in other states?
 "A They were made known to me, or identified to me as being relatives; they were in-laws, is what they were identified to me as." (R 145-146)
Mrs. Diane Smith, an employee in the Madison County Circuit Clerk's office, testified that a subpoena was issued twice for Taylor's attendance at trial and was mailed to his address on "14th Street." The subpoena was returned not found on both occasions. Mrs. Smith testified that no change of address was listed for Taylor.
Taylor's probation officer T.C. Bill testified that Taylor was currently a delinquent probationer.
 "When Mr. Taylor did not report to our office as instructed, I phoned the residence at 2103 14th Street and talked to a Mr. Thomas who, during the months of September and October, 1981, was living in the residence, a rental, at that time. He stated that Mr. Taylor had moved out of the residence, lock, stock and barrel, gave me the name and address and phone number of an employer and I contacted them and they said that Mark Taylor had never been employed by them at all.
 "One evening I went by the residence at 2103 14th Street and again talked to Mr. Thomas and he stated that he had not seen Mr. Taylor in over thirty days; had no idea where he was, or anything of that nature. Based on that information I filed the appropriate report with the court in Birmingham." (R. 157)
Mr. Bill stated that a warrant was currently outstanding for Taylor's arrest for being a delinquent probationer. At the conclusion of Mr. Bill's voir dire examination, the trial court determined that Taylor's testimony at the preliminary hearing was admissible and allowed it to be read into evidence.
Besides providing an eye-witness account of the incident, Taylor testified at the preliminary hearing that his address was "2103 Fourteenth Street, Southwest here in Huntsville." (R. 161) Furthermore, we note that Taylor was subjected to a rigorous and thorough cross-examination concerning *Page 978 
his recollection of the events by defense counsel, the same counsel who represented appellant at trial and who now represents him on this appeal.
As in Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531,65 L.Ed.2d 597 (1980), defense counsel's questioning of Taylor partook of cross-examination as a matter of form and also comported with the principal purpose of cross-examination:
 "To challenge `whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed.'" 100 S.Ct., at 2541
Thus, we have no difficulty in finding that Taylor's prior testimony bore an adequate "indicia of reliability" to be admitted. The Supreme Court in Roberts, supra, quoting fromCalifornia v. Green, 399 U.S. 149, 90 S.Ct. 1930,26 L.Ed.2d 489 (1970) reaffirmed that:
 "Since there was an adequate opportunity to cross-examine [the witness], and counsel . . . availed himself of that opportunity, the transcript . . . bore sufficient `indicia of reliability' and afforded `the trier of fact a satisfactory basis for evaluating the truth of the prior statement.'" 100 S.Ct., at 2542, 2543
As to the issue of Taylor's unavailability, by applying the principles enunciated in Roberts, supra, and authorities cited therein, to the facts in this case which are set out above, there can be no question that the State made a good-faitheffort to obtain Taylor's presence at trial. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." Roberts, 100 S.Ct., at 2543;California v. Green, 90 S.Ct., at 1951. The law does not require the doing of a futile act. Roberts, supra. And while the State might have undertaken other steps in an effort to find Taylor, "[o]ne, in hindsight, may always think of other things." 100 S.Ct., at 2544.
In conclusion we find that the State carried its burden of demonstrating that Taylor was constitutionally unavailable for purposes of appellant's trial.
We have carefully examined the issues raised by appellant and have found no error prejudicial to his substantial rights. The circuit court's judgment of conviction is, therefore, due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] "A nod or head-shake is as much a `testimonial' or `communicative' act in this sense [for Fifth Amendment purposes] as are spoken words." Footnote 5, Schmerber v.California, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908.
[EDITORS' NOTE: PAGES 979-983 CONTAINED DECISIONS WITHOUT PUBLISHED OPINIONS.]
 *Page 146