[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1339 
Anthony O'Hara Johnson was convicted by a Jefferson County jury of robbery in which the victim was intentionally killed, and sentenced to death. This court affirmed the conviction,Johnson v. State, 399 So.2d 859 (Ala.Cr.App. 1979). However, the Supreme Court of Alabama affirmed in part, reversed in part, and remanded with directions requiring a new sentencing hearing. Johnson v. State, 399 So.2d 873 (Ala. 1979). The conviction was then reversed and the case remanded upon the authority of Beck v. State, 396 So.2d 645 (Ala. 1980). Johnsonv. State, 399 So.2d 875 (Ala.Cr.App. 1981). Johnson was retried, reconvicted, and resentenced to death, and is now before us on appeal from that conviction and sentence.
The trial judge made written findings of fact* which we find to be correct. No defense was offered. The trial judge found:
 "That the victim, William Albert Farmer, owned and operated a jewelry store operated at 1902 First Avenue, North, Birmingham, Jefferson County, Alabama, and it was at this location that the robbery took place. Just before the robbery, the defendant and his companion went into the store next door, where a record player and stereo were being played and asked the clerk to turn the volume of the music up. This request was made by the defendant, Anthony O'Hara Johnson. Very shortly thereafter, the defendant and his companion proceeded into Farmer Jewelry Store, and robbed and killed Mr. Farmer, and ransacked the jewelry store of watches, rings, and other items of Jewelry. The companion proceeded out on the sidewalk and offered the occupant of an automobile, which was parked at the curb, ten dollars to drive him and his friend away from the location, and the occupants of the automobile refused and left. There was a witness there on the sidewalk, who was talking to the occupants of the automobile who heard and reported the conversation. She saw the defendant then come out of the store and proceed behind his companion who had walked around the corner and was boarding a bus. The defendant also boarded the bus, which proceeded North on 19th Street. The witness on the sidewalk summoned a policeman who appeared nearby on a three-wheel *Page 1340 
motorcycle, who came to the scene and put out a police call, which resulted in the bus being stopped and the defendant being removed from the bus. The proceeds of the robbery were found nearby on the bus, and they, as well as the gun, were recovered by the police. There was a witness seated on the bus who identified the defendant as the man who sat in a particular seat with the two bags of loot under his arm and who reported the conversation between the defendant and his companion wherein the defendant suggested that the companion put his arm over the bags so that no one could see what was in the bags. One of the bags had one or more holes in it, and the contents were visible through the holes in the bag.
 "This witness further reported that the companion had a billfold and was counting money in the billfold, and was instructed by the defendant not to be counting the money until they [got] where they are going.
 "A billford with the victim's identification, as well as driver's license, [was] found in the two bags of loot. When the police stopped the bus some six blocks north of the scene of the robbery, the defendant and his companion moved to the rear seat in the bus, leaving the bags of loot unattended, where the defendant had originally kept them. When the police boarded the bus, asking questions generally as to who had the bags of loot, no one would reply, but from the direction of the eyes of people seated thereby, as well as the fact that the defendant was perspiring heavily, the officer was led to arrest the defendant. His companion was not apprehended.
 "The scene of the robbery was properly secured by the police, and was turned over to the evidence technicians who made pictures and lifted a number of fingerprints from the jewelry store, which were found to be the fingerprints of the defendant. The body of William Albert Farmer was lying on the floor. He was lying on his stomach on the right side of his face. His right arm was doubled back under his head as if he were using it as a pillow. His left arm was in a raised position, joining the right hand with the hand and fingers of the left hand lying over the right hand. His hands were placed in such a manner as to appear as if he had been using his right hand as a partial pillow. There was a .22 caliber bullet wound in the center of the back of his neck at the base of the brain.
 "An autopsy was performed and the fragments of the bullet were removed and were examined by the Department of Forensic Sciences, but were not sufficient on which to base a ballistics comparison with the gun found in the bag with the loot which had been in the possession of the defendant."
 I
On appeal, Johnson first contends that the admission into evidence of state's exhibit "EE", a fingerprint record card, and reference to state's exhibit "CC", a photograph of Johnson, although not objected to, constitute plain error. Rule 45A states:
"SCOPE OF REVIEW IN DEATH CASES"
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
State's exhibit "EE" was a police fingerprint card. On the front of the card are the name of the appellant Johnson, a series of police numbers and an FBI number, the fingerprints themselves, and the signature of the taker of the impressions, and the date taken. The reverse side of the fingerprint card contains the name of the appellant, his signature, the offense charged at the time the fingerprints were taken, a description, and other information. Also on the back of the card is a list of dates of *Page 1341 
arrests. The arrest list shows an arrest for burglary in 1977 followed by a release, an arrest for burglary and grand larceny in 1977 followed by a release, an arrest in 1978 for grand larceny from a person followed by a release, and the present charge of murder in 1978 followed by a delivery to the sheriff's office. The card also shows the original arrest in 1973 for robbery followed by a delivery to the sheriff's office.
The first witness called to establish the fingerprint identification was Jack T. Brand, a policeman and former fingerprint officer in the city jail. He testified that one of his duties at the city jail was to take inked fingerprints, and he described the procedure. He was questioned regarding whether he signed the fingerprint card and whether the person whose fingerprints were taken signed the cards, to both of which questions he answered in the affirmative. Another card marked as state's exhibit "DD" contained the palm prints of appellant Johnson. Brand identified Mr. Johnson as the person whose picture appeared in state's exhibit "CC" for identification, which he testified was taken at the same time as the fingerprint cards were made; the photo and the print cards were all assigned the same identification number at the same time. He testified that the prints were made in the ordinary course of business of fingerprinting people at the Birmingham City Jail and were kept by the Birmingham Police Department in its Identification Bureau.
Sandra Tiplett, a fingerprint technician, testified to her qualifications, including employment with the Federal Bureau of Investigation in Washington. She proceeded to use a blackboard to explain in some detail the science of identification by fingerprint. There were then offered for identification state's exhibits "V", "W", "X", "Y", "Z", "AA", and "BB", all latent impressions on "lifts" from Farmer's Jewelry Store. She compared state's "DD" and "EE" with the latent impressions reflected by the other referenced exhibits, and found the prints to be of the same person. The latent print exhibits were received into evidence.
Then the state offered photocopies of exhibits "DD" and "EE" so that "the master print cards could be kept in the files of the Birmingham Police Department." The following ensued:
"THE COURT: Okay, without objection, they're in.
 "MR. STRIPLING: Your Honor, may we approach the bench?
(Attorneys approach bench for side bar).
 "MR. CAHILL: (Continuing). I will ask you, Sandy, does State's Exhibit "DD" for identification, a copy, appear to be substantially the same as the original that you keep in your files at the Birmingham Police Department?
"A: Yes, sir.
 "Q: Okay, and State's Exhibit "EE" for identification, does that appear to be a copy of the inked prints that you keep in your files at Birmingham Police Department?
"A: Yes, sir.
 "MR. CAHILL: Okay, and then we would offer "EE" and "DD", substitutes into evidence at this time.
"THE COURT: Okay, mark them as in."
The case then proceeded with the introduction of evidence regarding evidence collection.
State's exhibit "CC" for identification was never offered into evidence. It is argued by appellant Johnson that the exhibit was a "mug shot" taken while he was in jail. However, it does not appear that the jury ever saw state's exhibit "CC", and that "CC" was used for purposes of securing the testimony of the fingerprint officer that "CC" was assigned the same number as "DD" and "EE" and that they were of appellant Johnson. The objections to receiving a mug shot into evidence are that the photograph suggests that the subject was in custody at the time the photograph was made. When it is not introduced, however, this suggestion does not carry over. The objectionable aspect of the photograph, the suggestion conveyed by the image itself, is never placed before the jury when it is not introduced. *Page 1342 
As a preliminary matter, we note that fingerprints have long been held to be admissible in Alabama courts. Leonard v. State,18 Ala. App. 427, 93 So. 56 (1922). On the other hand, it is equally well-settled that:
 "On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question."
C. Gamble, McElroy's Alabama Evidence § 69.01(1) (3rd ed. 1977), hereinafter cited as McElroy's.
The rule is similar in this state as regards prior arrests; this court in Paul v. State, 47 Ala. App. 115, 251 So.2d 246, cert. denied, 287 Ala. 739, 251 So. 248 (1971), stated: "Prior arrests of the accused on other charges which have no relevancy except as tending to show his bad character are not admissible. . . ." Id., 47 Ala. App. at 117, 251 So.2d at 248.
Other courts have grappled with the problem of receiving into evidence master fingerprint cards that contain a record of prior convictions or prior arrests, see e.g., United States v.Dressler, 112 F.2d 972 (7th Cir. 1940). In the case of a photograph with an indication of a criminal record written on the back, our courts have approved the procedure of obliterating or covering the extraneous matter, Burkett v.State, 439 So.2d 737 (Ala.Cr.App. 1983), with an admonition to the jury to "leave it covered up." See also Moon v. State,22 Ariz. 418, 198 P. 288 (1921), and State v. Viola, 82 N.E.2d 306
(Ohio Ct.App), app. dism'd, 148 Ohio St. 712, 76 N.E.2d 715
(1947), cert. denied, 334 U.S. 816, 68 S.Ct. 1070,92 L.Ed. 1746 (1948). This court has held that in order to preserve error from the admission of identification material with evidence of a criminal record on the back, an objection specifically detailing the error must be made; otherwise, the error is not preserved for appellate review. Dorsey v. State,406 So.2d 457 (Ala.Cr.App. 1981). We have also held, however, in Brown v. State, 369 So.2d 881 (Ala.Cr.App. 1979), that admission of a fingerprint record card such as the one employed by the Birmingham Police Department was, in that case, reversible error. "The extraneous information contained on the exhibit reasonably implied the existence of a prior criminal record of the appellant." Id., at 884. The court, per Judge Tyson, stated:
 "The mere existence of recorded fingerprints does not per se imply the existence of a criminal record. The error in this case was committed by showing the jury the additional extraneous and highly prejudicial information contained on the photostatic copy of the appellant's master card. . . . Nevertheless, we feel that the introduction of State's Exhibit Four served to place before the jury indirectly information which the State, by virtue of the appellant's not having taken the stand, was forbidden to present directly." (Citations omitted.) Id.
Thus the issue is presented to us as stated in Annot., 28 A.L.R.2d 1135 (1953):
 "The introduction in evidence of a fingerprint record containing extraneous material which in itself is incompetent may or may not constitute reversible error, depending on such factors as whether the material was or was not seen by the jury or whether the objection thereto was waived by the defendant."
Addressing first the issue of whether the material was or was not seen by the jury, we note first that photocopies were made of exhibit "EE". Further, we note that thereafter there was a side bar conference held at the request of the defense counsel. The state then established that the photocopy of "EE" was a copy of the fingerprints kept in the file, so the substitutes were received into evidence. It is not clear whether a photocopy of only the front of "EE" was received into evidence or whether a copy of both front and back were received into evidence. This may *Page 1343 
have been the subject of the side bar conference. The front of the card shows the name, "Anthony O'Harry Johnson" and aliases, "Tony Johnson" and "Anthony O'Hara Johnson." The card is signed on the back "Anthony O'Harry Johnson." The "aliases" are simply versions of the principal name shown. At the left of one of the blanks on the card are the letters "FBI" and thereafter are printed the numerals and letter constituting the FBI number. To the left of another blank are the words "Police No." and following that are a typed number and five handwritten numbers. The card is signed on the front by Jack T. Brand and dated 10-24-73. Admission, over proper objection, of the data on thefront of a similar Birmingham Police Department master fingerprint card alone was held to be reversible error inBrown, even though the back was not in evidence. While there may be doubt whether the jury observed or examined the back of the card, we may certainly infer that they observed the front of the card. It, therefore, initially appears that Brown
controls this case and requires us to again reverse the appellant's conviction. However, in Brown, the defense timely objected to the extraneous information being open to inspection by the jury, whereas in the present case, there was no such objection.
We next consider whether the right to object to the admission of the copy of the card was waived by the appellant. In a noted fingerprint card case, United States v. Dressler, supra, the court recited that no one, not counsel for the state, counsel for the defense, nor the court, was aware of the existence of the defendant's "criminal history" on the back of the fingerprint card. Such unknowing and unintentional exposures to the jury of such items resulted in reversals in Farese v.United States, 428 F.2d 178 (5th Cir. 1970), and United Statesv. Bruscino, 687 F.2d 938 (7th Cir. 1982) (en banc), cert. denied, 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d 468 (1983). But that situation did not occur here. The attorneys knew what was on the card. On direct examination, Officer Brand was asked whether the name of the person whose print was taken was on both sides of the card and whether the person was asked to sign the card. To both questions the witness answered affirmatively:
 "Q: And I'll ask you, is the name of the person whose print is being taken, is it typed in or placed on this card?
"A: Yes, sir."
"Q: Is it placed on both sides of the card?
"A: Yes, sir.
 "Q: And are they asked to sign this particular card?
"A: Yes, sir."
The signature line is on the back of the card where the arrest record appears. Brand testified that his own name appeared on both sides of the card. On direct examination, the following occurred:
 "Q: And in the place on the card where the individual whose prints were taken, whose name appears there, please?
"A: Anthony O'Harry Johnson.
"Q: And does your name also appear there?
"A: Yes, sir.
"Q: And is it at the bottom of the card?
"A: Yes, sir.
 "Q: And is it on both sides of the particular card?
"A: Yes, sir."
On cross-examination the following occurred:
 "Q: Okay. Now, when you sign this fingerprint card, can I see this card, please?"
 "[The court reporter noted] (Mr. Stripling looks at card and shows it to the defendant)."
The cross-examination of Officer Brand principally dealt with the authenticity of his signature on the front of the card:
"Q: Officer Brand, you signed these cards, right?
"A: Yes, sir."
It would be implausible to believe that the appellant himself as well as his trial counsel did not know that the prior arrest information was on the back of the fingerprint card, especially in light of the court reporter's notation, "Mr. Stripling *Page 1344 
looks at card and shows it to the defendant." Also, the record indicates that the fingerprint card was freely and openly passed amongst the attorneys and the judge. From the foregoing, we find as a fact that the attorneys were conscious and aware of the contents of both the front and the back of the master fingerprint card, a copy of which was admitted into evidence as exhibit "EE". Because of this knowledge, this case is distinguishable from United States v. Dressler, supra, and its progeny, and because there was no objection by defense counsel to the jury's viewing the fingerprint card with the extraneous information thereon, this case is likewise distinguishable fromBrown v. State, supra. Instead, this case is more closely akin to United States v. Richardson, 562 F.2d 476 (7th Cir. 1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776
(1978), wherein "a photograph of an FBI file card of [the defendant's] palm print" was admitted into evidence without objection. The reverse side of that fingerprint card was captioned, "Bob Turner, Sheriff — Oklahoma County Bureau of Identification." thus inferring that he had "past contacts with a law enforcement agency." Although that card did not contain numbers filled-in on the "FBI No." blank, as was the case in the instant appeal, the wording in that opinion aptly applies to the instant appeal:
 "Initially, we note that neither Wilson's nor Richardson's attorney objected to the admission of the above items on the ground raised here. Any error in their admission is thus waived, unless it rises to the level of plain error. The plain error rule is of particular significance here because the error complained of could have been easily corrected at the time of the admission of the evidence by covering the extraneous information on the exhibits.
". . .
 "While the submission of the reverse side of the palm print card to the jury possibly could have been somewhat prejudicial to Richardson, we do not think that the possible prejudice engendered was severe enough to constitute plain error. . . . Accordingly, we believe the possibility of prejudice that resulted from submission of the reverse side of the palm print card was remote. Moreover, any possible prejudice easily could have been prevented by defense counsel if he had objected to the submission at trial. In view of the above, we hold that the submission of the card was not plain error affecting the substantial rights of the defendant within the meaning of Rule 52 of the Federal Rules of Criminal Procedure."
Id., at 478-79. We likewise do not believe that this is plain error, and furthermore, we find that the appellant's action, or inaction, constituted a waiver. To hold otherwise would be to reverse the conviction based on what is in essence invited error. "An accused cannot by his own voluntary conduct invite error and then seek to profit thereby. It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice." Aldridgev. State, 278 Ala. 470, 179 So.2d 51, 54 (1965). See alsoSpears v. State, 428 So.2d 174 (Ala.Cr.App. 1982); McDaniel v.State, 418 So.2d 832 (Ala.Cr.App.), cert. denied, 418 So.2d 934
(Ala. 1982); Sullivan v. State, 394 So.2d 76 (Ala.Cr.App. 1981).
We further conclude that this is a case where evidence of guilt is so overwhelming that evidence of previous arrests was not significant, and its admission was harmless error in light of the strong evidence identifying Johnson as the perpetrator.
 II
The appellant also contends that the trial court erred when it allowed the prosecutors to read to the jury the prior testimony of two witnesses who testified at the appellant's first trial but who were unavailable at the time of the retrial. The general rule regarding the admissibility of an absent witness's former testimony is as follows:
 "The testimony of a witness, in a former trial or action, given (1) under oath, (2) before a tribunal or officer having by *Page 1345 
law the authority to take testimony and legally requiring an opportunity for cross-examination, (3) under circumstances affording the party against whom the witness was offered an opportunity to test his credibility by cross-examination and (4) given in a litigation in which the issues and parties were substantially the same as in the present cause, is receivable as evidence in the present trial (5) when the personal attendance of the witness to testify in the present trial is not feasible."
McElroy's § 245.07(1). See also California v. Green,399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), and Miles v. State,366 So.2d 346 (Ala.Cr.App. 1978). This general rule has been a part of Alabama's jurisprudence for many years. See Marler v.State, 67 Ala. 55 (1880). It is likewise well established that it is within the discretion of the trial court to determine whether the movant has adequately proven that "the personal attendance of the witness to testify in the present trial is not feasible." Washington v. State, 274 Ala. 386, 148 So.2d 206
(1962), Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala. 1979), Napier v. State,377 So.2d 1135 (Ala.Cr.App.), cert. denied, 377 So.2d 1138 (Ala. 1979),Neal v. State, 460 So.2d 257 (Ala.Cr.App. 1984). See alsoMcElroy's § 245.07(9).
 A.
One of the grounds for nonproduction of a witness is "that the witness cannot be found after [a] diligent search."McElroy's, § 245.07(8). The appellant contends that the trial court abused its discretion when it ruled that the State had sufficiently proved "due diligence" in attempting to locate the two missing witnesses.
The retrial of this case was scheduled for May 3, 1982. Prior thereto, the State was unable to locate two of its prospective witnesses who had testified during the original trial. One of the district attorney's investigator's was attempting to locate the absent witnesses but was unsuccessful. On May 3, 1982, the trial was "passed over" to May 24, 1982. Just before the latter date, the investigator was required to undergo emergency surgery, so on May 20, 1982, Investigator Morris began looking for the witnesses. He testified that he went to the last known address for each of the witnesses. At one of the residences, the sister of the missing witness stated that the witness had moved several months before, that she had not been seen or heard from, that she had supposedly married and changed her name, and that the sister had no way of contacting her. Regarding the other absent witness, Investigator Morris went to the last known address. The occupants there did not know the witness, and neighbors only knew him casually but had not seen him for several months. They believed that the witness had joined the armed services. Without the individual's social security number, an Army recruiter was unable to provide any information. Investigator Morris testified that he then contacted both the telephone company and the power company, and learned that neither had an account listed for either individual.
In another capital case with facts similar to the above, we held:
 "These facts . . . are more than sufficient to justify the trial court's conclusion that [the witnesses were] 'unavailable' for trial. They indicate more than a mere 'temporary' disappearance, and demonstrate 'due diligence' on the part of the prosecution to locate [them], even though, as can always be argued, other steps might also have been taken.
 "A review of the evidence from the 'unavailability' hearing in the instant case demonstrates that the trial court did not abuse its discretion in admitting [the witnesses'] prior testimony. See Napier v. State, supra, and cases therein cited; Alexander v. State, 418 So.2d 973
(Ala.Cr.App. 1982)."
McGinnis v. State, 443 So.2d 1289, 1291 (Ala.Cr.App. 1983). Seealso Kelsoe v. State, 356 So.2d 735 (Ala.Cr.App. 1978). That holding applies in toto to the instant appeal.
 B.
The appellant contends that because Investigator Morris's testimony concerning *Page 1346 
his inability to locate the missing witnesses was based on hearsay — what people told him about the respective witnesses' whereabouts — his testimony was not proper, and, therefore, the trial court erred in accepting such testimony as a predicate for establishing the admissibility of the former testimony.
The appellant's contention is perhaps best answered by simply quoting from McElroy's:
 "There are so many various types of evidence admissible as tending to show unavailability of a witness that a complete listing is not feasible in the present text. Mention will be made, however, of a few of them. It has been held, for example, that, as tending to show the thoroughness of and diligency used in making a search for the absent witness, testimony is admissible from the one who searched for the witness as to replies which he received from others to his inquiries as to the whereabouts of the witness."
McElroy's § 245.07(9). See also Marler v. State, supra ("The [reason for the unavailability] of Redman could be proved by any competent evidence satisfactory to the mind of the court,"67 Ala. at 65).
 C.
While still out of the presence of the jury, the prosecutor made the following statement as part of his argument to the Judge to allow the use of the former testimony: "And that Janice Matthews, a witness, did testify in that case and theofficial transcript was taken down by Mr. Narkates which has been made a part of the court record and a part of the appeal." (Emphasis added.) Earlier in the proceedings, the prosecutor had stated the following:
 "The transcript that was made of her testimony that was made at the prior trial, it's contained in volume 2 and volume 1, of the official transcript made by the court reporter. I had checked it out of the clerk's office and had given this to Mr. Stripling and Mr. Heller [the defense attorneys] at the time to review, and apparently volume 1 is at Mr. Heller's home."
At no time during the trial did appellant's attorneys object to the use of the transcript based on a claim that it was not an official or certified transcript.
At the motion for new trial hearing, appellant's attorney claimed as a ground for new trial that "the court reporter didn't testify or didn't verify the transcript. . . ." The prosecution responded that the court reporter's "certification [was] at the end — you know — the same as any other transcript." The transcript itself was never placed into evidence, but simply read from — the judge stated, "I think there was an objection to the admission of the transcript into evidence and it was just read to [sic] from" — and, therefore, it is not now available for inspection.
It was never in dispute at the trial level, nor is it argued on appeal, that use of an official court reporter's transcript is not a proper procedure for proving a person's former testimony. See McElroy's §§ 268.01(1) and 268.02. We believe that it was reasonably proven that the former testimony of the unavailable witnesses was read from an official court reporter's transcript that had been duly certified.
 III
The last issue raised by the appellant is that his death sentence constitutes cruel and unusual punishment proscribed by the Eighth Amendment, based on the contention that he did not kill, attempt to kill, or intend that a killing occur. The United States Supreme Court has held that when there is such failure to prove the requisite intent, the death penalty is not allowed. Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368,73 L.Ed.2d 1140 (1982).
The facts necessary to show that the appellant had the intent to kill, and thus distinguishing Enmund v. Florida, supra, are adequately stated in the State's brief, from which we quote:
 "While there were no eyewitnesses to the murder and no confession, two factors combide [sic] to prove beyond a *Page 1347 
doubt the Appellant's intent to kill. First, immediately prior to the robbery/murder the Appellant and the co-defendant entered a store next door to that of the victim and the Appellant asked the owner to turn up the volume of the music being played through a speaker located by the open front door. (R. 155-159) This ploy was undoubtably designed to muffle the sound of the gun used to kill William Albert Farmer; proof of it showed that the Appellant and the codefendant intended to kill Farmer.
 "Second, contrary to the Appellant's argument in brief, the gun used to kill Farmer was tied to the Appellant. When the appellant walked out of the victim's jewelry store he was carrying a polka-dotted bag which appeared to contain watches. (R. 274 275, 313). His companion carried a leather satchel. (R. 268, 271, 272, 305, 315, 340) Each was still carrying the same bag when they boarded the bus. (R. 311) The two bags were observed placed beside the Appellant while the two men were on the bus. (R. 204, 207) When the bus was stopped by the police the Appellant and the co-defendant left the two bags on the seat and moved to the back of the bus. (R. 186, 188, 208 209, 223) In the cloth bag, not the leather satchel, the gun was found. (R. 224 225, 232) While it was not shown positively that the bullet that killed William Albert Farmer was fired from this gun, there was testimony that the bullet bore the class characteristics of the gun. (R. 390 
391) This evidence, which show [sic] that the Appellant knew that deadly force would be used to accomplish the robbery and that the Appellant was the person who used this force, in addition to the fact that William Albert Farmer was shot in the back of the neck execution-type, firmly established the Appellant's intent to kill."
To these facts we add that during the sentencing phase of the trial, the appellant testified to the jury, during which he admitted that the .22-caliber pistol was his and that his partner carried a .32-caliber pistol. The expert witnesses had previously testified that the bullet fragments removed from the deceased were parts of a .22-caliber bullet.
Based on the above facts, we believe that Enmund v. Florida,supra, does not apply to the instant case.
 IV
As required by § 13A-5-53(a), Code of Alabama 1975, this court reviews the propriety of the imposition of the death penalty in this case. Our review must include a determination of the following questions:
 (1) Was any error adversely affecting the rights of the defendant made in the sentence proceedings?
 (2) Were the trial court's findings concerning the aggravating and mitigating circumstances supported by the evidence?
 (3) Was the death penalty the proper sentence in this case?
As to the first question, we have reviewed the sentence proceedings and have found no error adversely affecting the defendant's rights. As to the second question, we have reviewed the record and are satisfied that the trial court's written findings concerning the aggravating and mitigating circumstances are fully supported by the evidence. See attached Appendix.
To answer the third question, whether the death penalty was properly imposed in this case, we must determine:
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Alabama Code § 13A-5-53(b) (1975); see also Beck v. State,396 So.2d 645 (Ala. 1981). *Page 1348 
There is nothing in the record before us which even intimates that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor. The fact that this appeal is the result of a retrial, pursuant toBeck, of a murder that occurred four years earlier, helps to remove the possibility of passion and prejudice.
Our independent weighing of the aggravating and mitigating circumstances leaves us with no doubt that the death penalty is appropriate in this case; we are in accord with the trial judge's opinion that the aggravating circumstances outweigh the mitigating circumstances. The sole applicable mitigating circumstance is that the appellant was twenty years of age at the time of the offense. We are of the opinion, as was the trial judge, that such circumstance is outweighed by the aggravating circumstances of prior convictions of robbery and assault with intent to murder when the appellant was sixteen years of age, and that at the time of the commission of the instant offense, the appellant was under sentence of imprisonment, i.e., parole.
In regard to the final determination this court must make, we find that the death penalty imposed on the defendant is not excessive or disproportionate to the penalty imposed in similar cases. See, e.g., Jones v. State, [Ms. 6 Div. 87, January 10, 1984] (Ala.Cr.App. 1984); Thomas v. State, 460 So.2d 207
(Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984); Jones v.State, 450 So.2d 165 (Ala.Cr.App. 1983); Singleton v. State,465 So.2d 432 (Ala.Cr.App. 1983), aff'd, 465 So.2d 443 (Ala. 1985); Bush v. State, 431 So.2d 555 (Ala.Cr.App. 1982), aff'd,431 So.2d 563 (Ala. 1983); Ritter v. State, 375 So.2d 270 (Ala. 1979); Jacobs v. State, 361 So.2d 640 (Ala. 1978).
We have searched the record as required by Rule 45A, A.R.A.P., and have found no error which adversely affected the rights of the defendant. The sentence of death was proper in this case. Therefore, the judgment of the trial court is due to be and is hereby, affirmed.
AFFIRMED.
All the Judges concur.
 APPENDIX FINDINGS OF FACT FROM THE PUNISHMENT HEARING
At the punishment phase of the trial before the jury, the State requested and it was granted that the evidence introduced in the trial in chief be incorporated into the punishment phase before the jury. The State further offered evidence through the Office of the Circuit Clerk of Jefferson County, that on the 23rd day of October, 1974, when this defendant was 16 years of age, the defendant and one or more black males robbed the Spidel Gems Company, which was located at 119-20th Street North, Birmingham, Jefferson County, Alabama, approximately one clock from where the Farmer Jewelry Company is located. During the course of the robbery of the Spidel Gem Company, a female clerk of said Spidel Gem Company was shot in the head during the course of the robbery, but the bullet did not break the skull and the victim survived the wound. On August 22, 1974, the defendant pleaded guilty to Assault with Intent to Murder, being Case Number 29171, and in Case Number 29172, plead guilty to the offense of Robbery, both cases being for the offenses committed during the course of the robbery of the Spidel Gem Company. On these two pleas of guilty, the defendant was sentenced to serve a term of imprisonment in the penitentiary for ten years in the robbery case and for two years in the assault with intent to murder case. At the time of the entering of pleas of guilty, the defendant made application for probation, which was subsequently denied.
It was further determined during the punishment phase of the hearing on cross-examination of the defendant, who testified on his own behalf, that at the time that the robbery occurred at Farmer Jewelry, that the defendant was on parole from the sentences for which he had been previously *Page 1349 
incarcerated for the robbery of the Spidel Gem Company. The defense that the defendant offered evidence from the defendant who stated that at the time of the first robbery of Spidel Gems that he was only fifteen years of age at the time, and had just come from Boys School. He further stated that he was in the company of two older individuals and that he looked up to them as they never had to work, but they always had money in their pockets, and seemed to be doing better that anyone else. Defendant further stated that he ran away from home at the age of nine, and had been in the Boys Industrial School or in Juvenile Court any number of times. The defendant denied that he had a weapon, and further did not shoot the victim in the Spidel Gem robbery, but tried to aid her in fact, after she had been shot by giving her aid and comfort in some degree. The defendant stated that at the time of the robbery of Farmer Jewelry, that he was in the company of Maurice Brooks, who was twenty-four years of age at the time, and the defendant was nineteen years of age. The defendant further stated that he and Maurice Brooks, the companion in this case, had been stealing boxes from the U.S. Postal Service and selling these items to make money. The defendant admitted further to any number of offenses that he was committing at the time, in an effort to raise money on his behalf. Defendant further stated that the brown leather satchel which was introduced into evidence, is one that he had stolen from Loveman's Department Store and that it was his companion, Maurice Brooks, that suggested that they rob the jewelry store. Defendant stated that he decoyed Mr. Farmer away from the back, and that the companion, Maurice Brooks, had the pistol, holding it on the victime, William Albert Farmer, as the defendant filled the bags with the items taken during the course of the robbery.
Defendant further stated that during the course of the time that he was filling the bags with the items taken in the robbery that he heard a shot and that his companion, Maurice Brooks, came running from the back of the store, and that the defendant then went to the aid of Mr. Farmer and found, in fact, that he was dead, having been shot in the back of the head by his companion, Maurice Brooks. Defendant denied that he shot Mr. Farmer, and further that he was shot by his companion, Maurice Brooks.
The defendant, upon cross-examination, stated that both he and Maurice Brooks were armed with pistols, but that Maurice Brooks had a .32 caliber pistol, and that the pistol which he had was that which was introduced into evidence, and was a .22 caliber rimfire revolver. The defendant further offered testimony by the defendant's mother, wherein she stated that the defendant had been brought up in a broken home, that she had six children to feed and that she brought food home from the job to feed them. The defendant's mother further stated that the defendant always ran with older boys, and seemed to have started getting into trouble when he was nine or ten years of age.
The State offered rebuttal testimony through the part of the Department of Forensic Sciences wherein expert testimony was offered to show that the bullet fragments recovered from the skull of the victim, William Albert Farmer, were of a .22 caliber rimfire of the same class characteristics as those of the pistol introduced into evidence and further identified by the defendant as belonging to him. The expert further testified that in his opinion, the bullet was of Remington Arm Manufacture and would be inconsistent with characteristics of a .32 caliber bullet.
At the conclusion of said hearing and summation of the attorneys, the Court again charged the jury as to the applicable law. The Court enumerated the aggravating circumstances to be the component portions of the capital offense itself, that being the robbery and the intentional killing of the victim, William Albert Farmer. The Court further charged on the additional aggravating circumstances as enumerated in Title 13-11-6. The Court, in its charge, charged the jury on all statutory mitigating circumstances, but may consider any other circumstances in mitigation. *Page 1350 
The Court further charged the jury that in determining the punishment, the jurors must avoid any influence of passion, prejudice, or any other arbitrary factor. Further, that the burden on the State to prove the aggravating circumstances was beyond a reasonable doubt and to a moral certainty. However, the mitigating circumstances need only be proven to their reasonable satisfaction. The Court further charged the jury that it is not the numerical number of aggravating circumstances as opposed to the number of mitigating circumstances, or the number of mitigating circumstances as opposed to the aggravating circumstances, but the seriousness or the gravity of the aggravating circumstances and the mitigating circumstances, as shown by the mitigating circumstances, proven to the jury's reasonable satisfaction.
The jury, after due deliberation and the Court makes the following finding, that in fixing punishment, the jurors were not influenced by passion, prejudice, or any other arbitrary factors, said punishment was fixed at death.
 FINDINGS OF FACTS FROM THE SENTENCE HEARING BY THE COURT
On this, the 18th day of June, 1982, the defendant, Anthony O'Hara Johnson, coming into open court with his counsel, the Honorable Mike Stripling and the Honorable Kenneth Heller, and the Deputy District Attorneys, Honorable Bob Cahill and Honorable Tom Sowa, on motion by said District Attorney Cahill, the evidence offered in the trial in chief which was heard by the jury in the guilt phase of the proceedings and the evidence presented in the punishment phase of the proceedings before the jury were incorporated in this hearing to be considered by the Court in affixing punishment. The Court is mindful of the evidence that has been previously introduced as set out hereinabove. The Court finds the following mitigating circumstances to exist:
The age of the defendant at the time the commission of the crime being twenty years of age. However, the Court was further mindful that at the commission of the crime by the defendant at this early age, that he had previously been convicted of or plead guilty to the offense of robbery and assault with intent to murder wherein the felonies involved the use or threat of violence to another person in the commission of the act.
The Court makes the further following finding:
That there were no other mitigating circumstances existing or as shown by the evidence, as the defendant does have a significant history of criminal activity, that the capital felony was not committed while the defendant was under the influence of extreme mental or emotional disturbance, as determined by the evidence. Further, that the victim was not a participant in the defendant's conduct, and further that the defendant and the accomplice committed the felony and the defendant's participation in the offense was of major participation wherein the defendant dired the fatal shot. Further, the defendant was not acting under extreme duress or under substantial domination of another party, and further that the capacity of the defendant to appreciate the criminality of his conduct was not impaired.
The Court makes the following findings of fact:
That the aggravating circumstances listed below did, in fact, exist:
The component of robbery did occur on the victim, William Albert Farmer; that the victim, William Albert Farmer, was intentionally killed by the defendant; that the capital felony was committed while the defendant was under a sentence of imprisonment, although he was serving the latter part of his sentence on parole at the time, as set out in Evans v. State,361 So.2d 654, p. 663. That the defendant was further previously convicted of another felony involving the use or threat of violence to the person.
After consideration of all matters that were presented to the Court during this hearing, both in mitigation and by aggravation, and taking into consideration all other *Page 1351 
matters that were properly before the Court, as hereinabove stated in this Order, and disregarding pleas or references to the Court to consider the sentence on the basis of passion or prejudice, this Court does now find and is convinced beyond a reasonable doubt and to a moral certainty, that the aggravating circumstances because of the gravity and seriousness of said circumstances above and brought before this court after the above mentioned mitigating circumstances, and they are sufficient to uphold the jury's punishment at death.
It is, therefore, the judgment of this Court that the defendant shall be sentenced to death.
ORDERED this the 18th day of June, 1982.
* See attached Appendix for the remainder of the trial judge's findings of fact involving the punishment and sentencing hearings.