SEE, Justice.
 

 Rick Allen Belisle was convicted of the capital offenses of murder committed during the course of a robbery,
 
 see
 
 § 13A-5-
 
 *325
 
 40(a)(2), Ala.Code 1975, and murder committed during the course of a burglary,
 
 see
 
 § 13A-5-40(a)(4), Ala.Code 1975, and was sentenced to death. The Court of Criminal Appeals affirmed his conviction and sentence.
 
 Belisle v. State,
 
 11 So.3d 256 (Ala.Crim.App.2007). Belisle subsequently petitioned this Court for the writ of certio-rari, and we granted certiorari review to address whether the decision of the Court of Criminal Appeals conflicts with
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986), and
 
 Cochran v. Ward,
 
 935 So.2d 1169 (Ala.2006). We also granted the writ to address whether Alabama’s method of execution is cruel and unusual. After reviewing the record and the briefs of both parties, we determine that the decision of the Court of Criminal Appeals does not conflict with prior case-law, and we conclude that Alabama’s lethal-injection protocols do not violate the Eighth Amendment to the United States Constitution.
 

 Facts and Procedural History
 

 On May 19,1999, Joyce Moore, a cashier at the T & J Kwik-Mart convenience store in Boaz, was bludgeoned to death with a six-pound can of peas and with a metal pipe.
 
 [1]
 
 State investigators arrested Belisle and Annette Belisle, Belisle’s wife, and charged Annette with capital murder and held Belisle on outstanding traffic warrants. Annette and Belisle were both eventually indicted on two counts of capital murder.
 
 [2]
 

 According to Belisle, investigators interrogated Annette on separate occasions over three days and obtained five separate inconsistent statements. Also according to Belisle, the State negotiated a plea agreement with Annette because those statements were illegally obtained and thus inadmissible at her trial. The State subsequently offered Annette a plea agreement in which she would serve a 15-year sentence, without the possibility of parole, in exchange for her testimony at Belisle’s capital-murder trial. The agreement was memorialized (hereinafter “the proffer”) and provides:
 

 “Annette Belisle is expected to cooperate fully in all continuing facets of the investigation and prosecution of Rick Belisle for the Capital Murder of Joyce Moore on or about May 19, 1999 at [the T & J Kwik-Mart convenience store] in Boaz, Alabama. [Mrs.] Belisle will be required to testify fully and truthfully at the trial of Rick Belisle. [Mrs.] Belisle has given several statements to law enforcement officials regarding this case. [Mrs.] Belisle agrees that her final statement given on June 14, 1999 to Investigator Bill Strickland was truthful and that the truth is as follows:
 

 “Prior to May 19, 1999 Annette and Rick Belisle were virtually destitute, having no money to get their van out of impound and to finance their planned trip to Missouri.
 

 “In order to remedy this situation, Rick Belisle proposed to ‘rob’ (technically, burglarize) the [T & J Kwik-Mart convenience store] where Annette Belisle had been previously employed.
 

 “Prior to the murder, Rick Belisle had indicated his intentions to bur
 
 *326
 
 glarize [the T & J Kwik-Mart convenience store] to Annette Belisle.
 

 “Rick Belisle had specifically communicated that he intended to burglarize the store on the evening of May 19,1999.
 

 “Rick Belisle had either asked for, or obtained from Annette Belisle, the combination to the store’s ([T & J Kwik-Mart convenience store]) safe and the number to the store’s alarm system.
 

 “Annette Belisle was privy to this information (the combination to the store’s safe and the number to the store’s alarm system) by virtue of her former employment with this entity.
 

 “Annette Belisle provided this information to Rick Belisle as per his request by writing it down for him.
 

 “At Rick Belisle’s instruction,
 
 Annette Belisle distracted Joyce Moore on May 19, 1999, while Rick Belisle concealed himself in the back of the store, in furtherance of their plan to burglarize the store.
 

 “In accordance with the plan,
 
 Annette Belisle left the store at approximately 10:50 p.m. on May 19, 1999.
 

 “Annette Belisle arrived home by 11:05 p.m.
 

 “Rick Belisle returned to the residence they shared at approximately 12:30 a.m.
 

 “Testify as to Rick’s appearance and the amount of money in his possession upon his return from the murder. (Approximately $898.00 and some change.)
 

 “Rick Belisle’s initial statement upon arriving home after the murder T think I killed her, Annette.’ (in reference to victim, Joyce Moore, cashier/clerk of the [T & J Kwik-Mart convenience store])
 

 “Annette Belisle witnessed Rick Be-lisle cut up coin wrappers that contained change stolen from T & J’s and flushed them down the toilet in their residence.
 

 “Rick Belisle confessed to hitting Joyce Moore eight times in [the] head with a can of food and also to repeatedly beating her about the head with a table leg or metal pole.
 

 “Rick Belisle described the victim choking on her own blood as he beat her.
 

 “Rick Belisle admitted to wearing latex gloves, during the murder, that he claimed to have obtained from inside the store to comprise [sic] his fingerprints.
 

 “Annette Belisle counted the proceeds from the robbery and counted approximately $898.00 in paper currency and approximately $70.00 in change and Rick bought concert tickets with $40.00 in quarters.
 

 “Annette Belisle was asked by Rick Belisle to see if he had blood in his hair while he was taking a bath subsequent to the murder.
 

 “Following the murder — the couple fled to Missouri where they stayed with a friend of Annette Belisle’s.
 

 “Annette Belisle agrees to testify where the proceeds of the robbery were spent.
 

 “Annette Belisle reaffirms the truth of the above portions of her earlier statement. Should Annette Belisle lie, fail to cooperate, or fail to fulfill fully any of the conditions of her plea agreement in any way, the agreement will be void, as will Belisle’s guilty plea, and the charge of capital murder, set forth in the original indictment against her, will be reinstated and all of her statements will be used against her in court (subject to constitutional challenges). It shall be
 
 *327
 
 unacceptable and a violation of the terms of this agreement for Annette Be-lisle to ‘forget’ or ‘fail to recall’ testimony previously provided and/or mentioned specifically herein.”
 

 (Emphasis in original.) Annette, however, successfully withdrew this plea, and the State offered her a new plea agreement, which provided that Annette would receive a 20-year sentence and that the State would remain silent regarding the possibility of parole.
 

 The case against Belisle proceeded. Before his trial, Belisle moved the trial court “for an order directing the State to reveal the identity of all confidential informants, to reveal any promises or understand[ings] (explicit or implicit) with any witness or informant, and to reveal whether any threats or inducements of any nature whatsoever have been made regarding any witness or informant.” The State, however, did not provide the defense a copy of the proffer from Annette’s original plea agreement. It was not until the eighth day of trial, the third day of the defense’s cross-examination of Annette, that, through Annette’s testimony, Belisle discovered the existence of the proffer.
 

 Belisle immediately moved the trial court to strike Annette’s testimony and for a mistrial based on the fact that the proffer had not been disclosed. The trial court denied both motions, and, in doing so, stated:
 

 “The Court finds, number one, that there was no prosecutorial misconduct or intent on the part of the prosecutors to hide [the proffer] from the defense. Number two, the Court denies the mistrial. And, number three, the Court finds that this document, on its face, is beneficial to the defendant and could be used to [his] benefit in this trial. So it really wouldn’t — I mean, to order a mistrial, I don’t think — I don’t think you are prejudiced any by the document being produced at this — at this hour.”
 

 Although the trial court did not grant Beli-sle’s motions, the proffer was admitted into evidence, and Belisle cross-examined Annette using the document.
 

 Belisle also made a pretrial motion in which he asked the trial court to exclude any mention of alleged prior bad acts, specifically, any allegations of spousal abuse. The trial court decided, and the State agreed, that the State would not present evidence relating to any prior criminal history or bad acts, or any instances of spousal abuse, absent notice to and a decision from the trial court. However, one of the State’s exhibits included a fingerprint card that bore Belisle’s name and fingerprints. It stated that the charge for which the fingerprint card had been issued was “ ‘Harassment (DV)’ ” and that the “ ‘date of offense [was] “01-02-99.” ’ ”
 
 Belisle,
 
 11 So.3d at 289. Belisle did not object to the introduction of the fingerprint card.
 

 Belisle argued at trial that the State could not prove its case beyond a reasonable doubt “because its main witness, Annette Belisle, was testifying in order to gain her freedom.” Petition at 5. The defense also cast blame for the murder on Annette and presented the testimony of three inmates who had been incarcerated with Annette: Kitty Hyatt, Valerie Wheeler, and Juanita Pitts. Kitty Hyatt testified that Annette said she was present at the murder but that she did not strike the victim initially. Valerie Wheeler
 
 *
 
 testified that she overheard Annette say that Annette had hit the victim with a can of peas and that the man with her had hit the victim with an iron bar. Juanita Pitts testified that Annette said that she struck the initial blow with a can and then asked Belisle to help.
 

 
 *328
 
 The jury convicted Belisle on both counts of capital murder. Belisle waived his right to a sentencing hearing before the jury, and he also waived the presentation of mitigating evidence. The trial judge sentenced Belisle to death. Belisle appealed his conviction, arguing, among other things, that he was entitled to a new trial because, he says, the State withheld the proffer and because, he says, Belisle’s fingerprint card had been introduced into evidence. The Court of Criminal Appeals affirmed his conviction and sentence.
 
 Belisle v. State,
 
 supra. Belisle subsequently petitioned this Court for the writ of certio-rari. We granted certiorari review to address whether the Court of Criminal Appeals’ decision conflicts with
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),
 
 Cochran v. Ward,
 
 935 So.2d 1169 (Ala.2006), and
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986). We also granted the writ to address whether Alabama’s method of execution by lethal injection is cruel and unusual.
 

 Discussion
 

 A.
 
 Standard of Review
 

 “ ‘ “This Court reviews pure questions of law in criminal cases de novo.” ’ ”
 
 Ex parte Jett,
 
 5 So.3d 640, 642 (Ala.2007) (quoting
 
 Ex parte Morrow, 915
 
 So.2d 539, 541 (Ala.2004), quoting in turn
 
 Ex parte Key,
 
 890 So.2d 1056, 1059 (Ala.2003)).
 

 B.
 
 Does the Court of Criminal Appeals’ decision conflict with
 
 Giglio v. United States,
 
 405 U.S. 150 (1972)?
 

 Belisle argues that in not disclosing the proffer “the State did not disclose the most significant piece of impeachment evidence with respect to its star witness, Annette Belisle.” Belisle’s brief at 6. Belisle argues that the State’s failure to disclose the proffer is grounds for reversal; thus, Beli-sle argues, the Court of Criminal Appeals’ refusal to reverse the conviction conflicts with
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The State counters that the proffer was irrelevant because it was associated with a plea agreement that was rendered void and that Belisle was not prejudiced by his late discovery of the proffer.
 

 The Court of Criminal Appeals held that the State’s failure to disclose the proffer did not amount of reversible error, stating:
 

 “Here, the document that was not disclosed to the defense was based on the first plea agreement that the State had with Annette, which was rendered void when she withdrew that plea. Also, both of Annette’s plea agreements were based on her testifying truthfully at her husband’s trial. There is no indication, as Belisle argues, that the prosecutor had compiled a transcript for Annette to follow at trial. Nor is there any indication that the defense was not given a copy of Annette’s statement to police. Annette was thoroughly cross-examined about her plea agreement and repeatedly said that the State had told her to testify truthfully. Under the facts of this case, there is no indication that the late disclosure of the document affected the outcome of the trial.”
 

 Belisle, 11
 
 So.3d at 296.
 

 Belisle argues that this holding of the Court of Criminal Appeals conflicts with
 
 Giglio v. United States,
 
 in which the Supreme Court of the United States held:
 

 “...
 
 Brady v. Maryland,
 
 373 U.S. [83], at 87 [ (1963) ], held that suppression of material evidence justifies a new trial ‘irrespective of the good faith or bad faith of the prosecution.’
 
 See
 
 American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a). When the ‘reliability of a given witness may well be determinative of guilt or
 
 *329
 
 innocence,’ nondisclosure of evidence affecting credibility falls within this general rule.
 
 Napue
 
 [v.
 
 Illinois,
 
 360 U.S. 264, 269 (1959)].”
 

 405 U.S. at 153-54, 92 S.Ct. 763. However, the Supreme Court also noted in
 
 Giglio:
 

 “We do not, however, automatically require a new trial whenever ‘a combing of the prosecutors’ files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict .... ’
 
 United States v. Keogh,
 
 391 F.2d 138, 148 (C.A.2 1968). A finding of materiality of the evidence is required under
 
 Brady,
 
 supra, at 87. A new trial is required if ‘the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ....’
 
 Napue,
 
 supra, at 271.”
 

 Giglio,
 
 405 U.S. at 154, 92 S.Ct. 763. “Impeachment evidence, however, as well as exculpatory evidence, falls within the
 
 Brady
 
 rule.”
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
 

 Thus, under
 
 Giglio,
 
 the progeny of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),
 
 [3]
 
 reversal is required when the State (1) suppresses (2) evidence favorable to a defendant and (3) that evidence is material.
 
 [4]
 
 Therefore, in order to determine whether the Court of Criminal Appeals’ decision conflicts with
 
 Giglio,
 
 we address each element.
 

 1. Was the evidence suppressed?
 

 Belisle argues that regardless of the status of the plea agreement, the proffer was impeachment material to which the defense was entitled. The State argues that it was not required to disclose the proffer because Annette had withdrawn from the plea agreement for which the proffer was created. We agree that the proffer was discoverable evidence that was suppressed.
 

 First, one of the State’s attorneys stated at trial that he did not “dispute that [the proffer] should have been turned over to the defense. Absolutely.”
 
 [5]
 
 Second, the State signed the proffer on April 29, 2002, at which time the trial court had already entered an order entitling Belisle to discover “[a]ll records, notes, memoranda, and documents in the possession of the state relating to the grant of immunity, promises, consideration, threats or any other inducements to any individual to obtain information or testimony about this crime by the State and any of its law enforcement or other agencies.”
 
 [6]
 
 Under
 
 *330
 
 both the terms of the order
 
 [7]
 
 and Rule 16.3, Ala. R.Crim. P.,
 
 [8]
 
 the State had a continuing duty to disclose the requested discovery as it became available. Therefore, the State’s argument that it was not required to disclose the proffer because the plea agreement it accompanied was later rendered void is incorrect. At the time the plea agreement was made and the proffer was signed, the State was obligated to disclose the proffer because it “relat[ed] to the ... promises, consideration, [and] threats ... to any individual to obtain information or testimony.” Therefore, we conclude that the proffer was subject to the discovery order and was suppressed.
 

 2. Is the suppressed evidence favorable to Belisle?
 

 Belisle contends that the proffer is “a ‘script’ on which the State’s key witness relied at trial [that] is unambiguously favorable to the defense.” Petition at 9. The State argues however, that the proffer was irrelevant and not favorable to the defense because “the evidence contained in a null and void proffer — detailing an agreement that was no longer in existence” — was not relevant to Annette’s credibility and, thus, not favorable to the defense.
 

 “[I]mpeachment evidence is favorable evidence.”
 
 Jefferson v. State,
 
 645 So.2d 313, 316 (Ala.Crim.App.1994).
 
 See also United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (“Impeachment evidence ..., as well as exculpatory evidence, falls within the
 
 Brady
 
 rule.”). “We have further held that exculpatory evidence, regardless of its trustworthiness or admissibility, should be disclosed .... ”
 
 Ex parte Brown,
 
 548 So.2d 993, 994 (Ala.1989). The proffer begins by stating that “the truth is as follows,” and then outlines expected testimony, emphasizes specific passages, threatens to reinstate capital charges if Annette does not cooperate fully, and lastly notes that “[i]t shall be unacceptable and a violation of the terms of this agreement for Annette Beli-sle to ‘forget’ or ‘fail to recall’ testimony previously provided and/or mentioned specifically herein.” Even if the original plea agreement and accompanying proffer were no longer in effect, the proffer certainly casts doubt on Annette’s testimony and the State’s handling of the case. Therefore, regardless of its admissibility, the proffer is impeachment material favorable to Beli-sle.
 

 3. Is the suppressed evidence material?
 

 “Last, but perhaps most importantly, we must determine whether the evidence was ‘material.’”
 
 Jefferson,
 
 645 So.2d at 316. Belisle argues that “impeaching Annette Belisle ... was critical to the defense.” Belisle’s brief at 9. The State argues that even if the proffer should have been disclosed, the Court of Criminal Appeals was correct that “‘[u]nder the facts of this case, there is no indication that the late disclosure of the documents affected the outcome of the trial.’ ” State’s brief at 19-20 (quoting
 
 Belisle,
 
 11 So.3d at 296).
 

 “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense,
 
 *331
 
 the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.”
 
 United States v. Bagley,
 
 473 U.S. at 682, 105 S.Ct. 3375.
 
 [9]
 
 The same rule applies when the State discloses
 
 Brady
 
 material in an untimely manner.
 
 See Coral v. State,
 
 628 So.2d 954, 979 (Ala.Crim.App.1992) (“Tardy disclosure of
 
 Brady
 
 material is generally not reversible error unless the defendant can show that he was denied a fair trial.” (citing
 
 United States v. Gordon,
 
 844 F.2d 1397 (9th Cir.1988);
 
 United States v. Shelton,
 
 588 F.2d 1242 (9th Cir.1978);
 
 Ex parte Raines,
 
 429 So.2d 1111 (Ala.1982); and
 
 McClain v. State,
 
 473 So.2d 612 (Ala.Crim.App.1985))).
 

 First, the issue of materiality distinguishes Belisle’s case from
 
 Giglio.
 
 In this case, the proffer was discovered and used by the Belisle during trial, and it contained no undisclosed promises or threats. In
 
 Giglio,
 
 however, “defense counsel discovered new evidence [during the pendency of the defendant’s appeal] indicating that the Government had failed to disclose an alleged promise made to its key witness [Taliento] that he would not be prosecuted if he testified for the Government.”
 
 Giglio,
 
 405 U.S. at 150-51, 92 S.Ct. 763. Furthermore, the facts of
 
 Gig-lio
 
 also indicate that Taliento testified at trial that he had received no promises for his testimony, and that “[i]n summation, the Government attorney stated, ‘(Talien-to) received no promises that he would not be indicted.’ ”
 
 Giglio,
 
 405 U.S. at 152, 92 S.Ct. 763. Because the facts of
 
 Giglio
 
 are distinguishable from those in this case, the Court of Criminal Appeals’ decision in this case does not conflict with
 
 Giglio.
 

 Even if the facts of
 
 Giglio
 
 were not distinguishable, however, Belisle still has failed to demonstrate that had the proffer been disclosed sooner, the outcome of his trial would have been different. The gravamen of Belisle’s arguments is that the proffer “destroys [Annette’s] credibility ... and casts suspicion- on the State’s investigation and handling of the case,” Beli-sle’s brief at 11, and that the State’s failure to disclose the proffer “prevented [Belisle] from formulating a key part of his defense.” Belisle’s brief at 12.
 

 Belisle’s second argument has been previously addressed by this Court.
 

 “Appellant’s argument that the information would have enabled more effective preparation for trial was rejected in
 
 United States v. Agurs,
 
 supra, 427 U.S. [97,] at 112 n. 20, 96 S.Ct. at 2401 n. 20 [ (1976) ], on the grounds that an argument could always be made that knowledge of the prosecutor’s case, both incriminating and exculpatory, would help defense counsel in preparation of the case for the defense. Therefore, the proper focus is upon the materiality in the nondisclosure or delayed disclosure of exculpatory information in determining the denial
 
 vel non
 
 of defendant’s rights of due process and fair trial ....”
 

 Ex parte Raines,
 
 429 So.2d 1111, 1113-14 (Ala.1982).
 
 [10]
 
 Thus, Belisle is not entitled
 
 *332
 
 to a new trial simply because having the proffer would have enabled him to more effectively prepare for trial.
 

 Belisle also argues that the proffer was material because “Belisle’s theory of defense was that the State did not prove beyond a reasonable doubt the elements of the crime because its main witness, Annette Belisle, was lying to gain her freedom. Impeaching Annette Belisle therefore was critical to the defense of this case.” Belisle’s brief at 9. He also argues that the “revelation of this agreement committing her to a specific version of facts would have undermined the State’s attempt to shore up Annette’s credibility and would have ‘put the whole case in such a different light as to undermine the confidence in the verdict.’ ” Belisle’s brief at 19 (quoting
 
 Kyles v. Whitley,
 
 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). We disagree.
 

 Belisle did not initially have access to the proffer; thus, he could not at that time attack Annette’s alleged “scripted” testimony. The record, however, indicates that Belisle had many other components of that proffer by which he could similarly impeach Annette: Belisle was aware of and cross-examined Annette on the fact that she was testifying as part of a plea agreement with the State; he was aware of the original plea agreement with which the proffer was associated; and he used Annette’s various previous statements given to State detectives to impeach her. Additionally, once the defense was made aware of the proffer, it was admitted into evidence, and defense counsel had the opportunity to thoroughly cross-examine Annette regarding it.
 
 [11]
 

 Moreover, the defense also presented other impeachment testimony from three inmates who had been incarcerated with Annette: Kitty Hyatt, Valerie Wheeler, and Juanita Pitts. Kitty Hyatt testified that Annette said she was present at the murder but that she had not struck the initial blow. Valerie Wheeler testified that she overheard Annette say that Annette had hit the victim with a can of peas and that the man with her had hit the victim with an iron bar. Juanita Pitts testified that Annette said that she struck the initial blow with a can and then asked Belisle to help. Thus, although Belisle did not
 
 *333
 
 originally have the proffer in his possession, Belisle was certainly able to establish that Annette had incentive to lie (and had lied to investigators), to demonstrate that Annette was not a credible -witness, and, once the proffer was disclosed, to cast suspicion on the State’s investigation and handling of the case.
 

 Although the proffer both was suppressed and was favorable to Belisle, so as to meet those two elements, we cannot conclude that it was material. Therefore, the decision of the Court of Criminal Appeals does not conflict with
 
 Giglio
 
 and Belisle is not entitled to a reversal.
 

 C.
 
 Does the Court of Criminal Appeals’ decision conflict with
 
 Cochran v. Ward,
 
 935 So.2d 1169 (Ala.2006), and
 
 Ex parte Johnson,
 
 777 So.2d 1351 (Ala.1986)?
 

 Before trial, Belisle moved the trial court to exclude any mention of alleged prior bad acts, specifically, any allegations of spousal abuse. The trial court decided, and the State agreed, that the State would not present evidence relating to any prior criminal history or bad acts or any instances of spousal abuse, absent notice to and a decision from the trial court. However, one of the State’s exhibits included a fingerprint card that bore Belisle’s name and fingerprints and that stated that the charge for which he was being fingerprinted was “ ‘Harassment (DV)’ ” and that the “ ‘date of offense [was] “01-02-99.” ’ ”
 
 Belisle,
 
 11 So.3d at 289. Belisle did not object to the admission of the exhibit; thus, the Court of Criminal Appeals reviewed the admission of the fingerprint card for plain error. That court held that “[b]ased on the unique facts presented in this case, we cannot say that the admittance of Belisle’s fingerprint card was plain error.”
 
 Belisle,
 
 11 So.3d at 294. The Court of Criminal Appeals noted that “[t]here is no indication that the jury was made aware of the contents of the fingerprint card,”
 
 Belisle,
 
 11 So.3d at 315, because the card was 1 of 115 exhibits and no reference was made to the card when it was admitted into evidence.
 

 Belisle argues that the Court of Criminal Appeals’ conclusion conflicts with
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986), in which this Court held that it was plain error to admit into evidence a fingerprint card containing a list of dates and prior arrests that had no relevance to the charged offense except to show the bad character of the accused. Belisle also argues that the Court of Criminal Appeals’ conclusion that “[t]here is no indication that the jury was made aware of the contents of the fingerprint card,”
 
 Belisle, 11
 
 So.3d at 315, conflicts with
 
 Cochran v. Ward,
 
 935 So.2d 1169, 1176 (Ala.2006), which states that an appellate court “presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.”
 

 1.
 
 Cochran v. Ward
 

 First, it does not appear that the decision of the Court of Criminal Appeals conflicts with
 
 Cochran.
 
 Although the Court of Criminal Appeals in
 
 Belisle
 
 concluded that “[t]here is no indication that the jury was made aware of the contents of the fingerprint card,” 11 So.3d at 315, it does not appear that the Court of Criminal Appeals concluded that the jury did not examine or consider the fingerprint card. Instead, it appears that the Court of Criminal Appeals was merely distinguishing this case from
 
 Ex parte Johnson
 
 and
 
 Brown v. State,
 
 369 So.2d 881 (Ala.Crim.App.1979), in which police officers testified regarding fingerprint cards being admitted into evidence and, thus, focused the jury’s attention on those fingerprint cards.
 
 See Belisle,
 
 11 So.3d 291 (“ ‘The circumstances of this case are clearly not as compelling as those of
 
 Johnson
 
 and
 
 Brown.’ ”
 
 (quoting
 
 *334
 

 Thomas v. State,
 
 824 So.2d 1, 18 (Ala.Crim.App.1999)));
 
 Ex parte Johnson,
 
 507 So.2d at 1354 (“On direct examination, Officer Brand was asked whether the name of the person whose print was taken was on both sides of the [fingerprint] card and whether the person was asked to sign the card.”); and
 
 Brown,
 
 369 So.2d at 883 (“Officer McDonald stated that the appellant had been admitted to jail and fingerprinted ‘about a year or two ago’ ....”). Therefore, it does not appear that the decision of the Court of Criminal Appeals conflicts with
 
 Cochran,
 
 and Belisle is not entitled to a reversal of his conviction or sentence on this issue.
 

 2.
 
 Ex paHe Johnson
 

 Belisle argues that the decision of the Court of Criminal Appeals conflicts with
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986).
 

 “This Court has held that the exclusionary rule prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.”
 
 Ex parte Drinkard, 777
 
 So.2d 295, 302 (Ala.2000). Thus, under Alabama law, the admission of the fingerprint card, which contained information about a prior arrest, was error. However, because Belisle did not object to the admission of the card, the error will constitute reversible error only if “ ‘such error has or probably has adversely affected the substantial right of the [defendant].’ ”
 
 Ex parte Johnson,
 
 507 So.2d at 1356.
 

 Before trial, Belisle moved the trial court to exclude any mention of alleged prior bad acts, specifically, any allegations of spousal abuse. The trial court decided, and the State agreed, that the State would not present evidence relating to any prior criminal history or bad acts or any instances of spousal abuse, absent notice to and a decision from the trial court. However, State’s exhibit 82 included “several ... documents' — a time card, a two-page letter to the Alabama Public Safety Department, a fingerprint-examination request form, and a copy of a fingerprint card for Annette, and a copy of a fingerprint card that bears the name ‘Rick Allen Belisle.’ ”
 
 Belisle,
 
 11 So.3d at 289. The exhibit was admitted with some testimony regarding its contents,
 
 [12]
 
 without objection from Beli-sle, and, apparently, without specific approval from the trial court.
 
 Belisle,
 
 11 So.3d at 289. Because there was no objection to the admission of this exhibit, we are limited to reviewing this issue for plain error.
 
 See
 
 Rule 45A, Ala.R.App.P.
 

 The front of Belisle’s fingerprint card includes the date the fingerprints were taken, Belisle’s fingerprints, his signature, his vital statistics, and other personal information. It also contains the “Signature of Official Taking Fingerprints,” a box titled “CHARGE” in which “Harassment (DV)” is written, a box titled “DATE ARRESTED OR RECEIVED” in which “01-02-99” is written, and a box titled “YOUR NO. OCA” in which 0199003 is written. It
 
 *335
 
 also contains boxes titled “FINAL DISPOSITION,” “ALIASES,” “FBI NO.” and “SID NO.,” but these were left blank. The reverse of the fingerprint card included Belisle’s address, as well as “01-02-99” written in a box entitled “DATE OF OFFENSE.”
 

 The Court of Criminal Appeals, addressing the admission of the fingerprint card under the plain-error standard of review, concluded:
 

 “Based on the unique facts presented in this case, we cannot say that the admittance of Belisle’s fingerprint card was plain error. Even if the jurors examined the exhibit, ‘[i]t is inconceivable that a jury could have been influenced, under the circumstances here, to convict [the appellant] of crimes of the magnitude charged here because of an oblique reference to a prior criminal record.’ ”
 

 Belisle,
 
 11 So.3d at 294. Belisle argues that this holding by the Court of Criminal Appeals conflicts with
 
 Ex parte Johnson.
 

 In
 
 Ex parte Johnson
 
 this Court addressed whether the admission of Johnson’s fingerprint card was plain error and required a reversal of Johnson’s conviction. 507 So.2d at 1352. In that case, the front of Johnson’s fingerprint card contained Johnson’s name, an alias, “a series of police numbers and an FBI number, the fingerprints themselves, and the signature of the taker of the impressions and the date of the card.” 507 So.2d at 1352. The reverse of the fingerprint card included Johnson’s signature, the offense charged at the time the fingerprints were taken, and a list of dates of arrest, which
 

 “show[ed] an arrest for burglary in 1977 followed by a release, an arrest for burglary and grand larceny in 1977 followed by a release, an arrest in 1978 for grand larceny from a person followed by a release, and the present charge of murder in 1978 followed by a delivery to the sheriffs office. The card also show[ed] the original arrest in 1973 for robbery followed by a delivery to the sheriffs office.”
 

 507 So.2d at 1352-53.
 

 At trial, the State admitted Johnson’s fingerprint card into evidence without objection, and a police officer testified regarding the exhibit.
 
 See Ex parte Johnson,
 
 507 So.2d at 1354. It appears that the front of Johnson’s fingerprint card was admitted into evidence, but it is unclear whether the reverse of the fingerprint card was admitted as well. 507 So.2d at 1354 (“ ‘It is not clear whether a photocopy of only the front of [State’s exhibit] ‘EE’ was received into evidence or whether a copy of both front and back were received into evidence.’ ” (quoting
 
 Johnson v. State,
 
 507 So.2d 1337, 1342 (Ala.Crim.App.1985))).
 

 Johnson was subsequently convicted of capital murder and was sentenced to death. The Court of Criminal Appeals affirmed Johnson’s conviction and sentence.
 
 Johnson v. State,
 
 507 So.2d 1337 (Ala.Crim.App.1985). The Court of Criminal Appeals concluded that Johnson had waived his right to appeal the admission of the fingerprint card because he was aware of the contents of the card but did not object when it was admitted into evidence. The Court of Criminal Appeals also concluded that “this is a case where evidence of guilt is so overwhelming that evidence of previous arrests was not significant, and its admission was harmless error in light of the strong evidence identifying Johnson as the perpetrator.”
 
 Johnson,
 
 507 So.2d at 1344.
 

 This Court granted certiorari review in
 
 Johnson.
 
 We first noted that
 

 “[i]t is apparent that the Court of Criminal Appeals concluded that a substantial right of the defendant had not been, or probably had not been, adverse
 
 *336
 
 ly affected by the admission of state’s exhibit ‘EE.’ As we read the opinion, this conclusion is based upon its determination that evidence of the defendant’s guilt was ‘so overwhelming that evidence of previous arrests was not significant, and its admission was harmless error in light of the strong evidence identifying [the defendant] as the perpetrator.’ However, the proper inquiry here is not whether evidence of the defendant’s guilt is overwhelming but, instead, whether a substantial right of the defendant has or probably has been adversely affected.”
 

 507 So.2d at 1356. We then concluded:
 

 “In the present case, the copy showing the front of exhibit ‘EE’ contained information which clearly revealed the defendant’s past contacts with law enforcement agencies. From this the jury could have readily inferred, at a minimum, that he had been arrested in the past. In our view, such an inference would have had an almost irreversible impact upon the minds of the jurors.”
 

 507 So.2d at 1357.
 

 Belisle contends that
 
 Ex parte Johnson
 
 is controlling, and he argues that the fingerprint card “leaves no room for question that [Belisle] had recently been charged with [an] offense. The reference to this prior charge was more than likely to have [a] tremendous impact on the jury.” Beli-sle’s brief at 25. The State counters, arguing that “a reversal is not required in this case because the admission of [the] fingerprint card in this case is distinguishable from the admission of the prejudicial] information [found on the fingerprint card] in
 
 Ex paHe Johnson.”
 
 State’s brief at 35.
 

 The State, like the Court of Criminal Appeals below, argues that this case is distinguishable from
 
 Ex parte Johnson,
 
 and analogous to
 
 Thomas v. State,
 
 824 So.2d 1 (1999), rev’d on other grounds,
 
 Ex parte Carter,
 
 889 So.2d 528 (Ala.2004).
 
 [13]
 
 In
 
 Thomas,
 
 the defendant’s fingerprint card was admitted without objection and contained,
 

 “[i]n addition to Thomas’s fingerprints, ... his name and signature, an alias (‘Tank’), his date and place of birth, his physical description, and his Social Security number. Below the signature blank appeared the sentence: ‘THIS DATA MAY BE COMPUTERIZED IN LOCAL, STATE AND NATIONAL FILES.’ The card also contained the name of the ‘OFFICIAL’ who took the fingerprints and the following information blocks with the information supplied as indicated: ‘DATE ARRESTED OR RECEIVED
 
 DOA
 
 ’-‘09-17-92’; ‘YOUR NO.
 
 OCA
 
 ’-‘C0062417’; ‘FBI NO.’[blank]; ‘SID NO.’-[blank]; ‘CAUTION’-[blank]; ‘STATE USAGE’[blank]; ‘NCIC CLASS-FPC’-[blank]; ‘CONTRIBUTOR’-‘AL0020000 SO MOBILE, AL.’; ‘CLASS.’-[blank]; ‘REF.’[blank]; and ‘FBI’-[blank], (R. 531.) There was no reference to the charge of any offense.”
 

 824 So.2d at 15-16 (capitalization in original). The Court of Criminal Appeals in
 
 Thomas
 
 concluded that there was no plain error, stating that “we believe the possibility of prejudice that resulted from the admission of the fingerprint card was remote.” 824 So.2d at 20. In so concluding, the
 
 Thomas
 
 court noted that the only reference to contact with law enforcement
 
 *337
 
 was a date in the box entitled “DATE ARRESTED OR RECEIVED” and thus determined that “the nature of Thomas’s presumed contact with law enforcement authorities was ‘oblique.’ ”
 
 Thomas,
 
 824 So.2d at 19. Additionally, the Court of Criminal Appeals in
 
 Thomas
 
 noted that its conclusion that the admission of the fingerprint card was not plain error “is buttressed by the fact that defense counsel apparently did not notice any allegedly potentially prejudicial information on the card when he viewed it, as disclosed by the record” and the fact that “testimony at trial contained references, properly admitted into evidence, to Thomas’s illegal drug activity.”
 
 Id.
 

 We find
 
 Thomas
 
 distinguishable from this case. The fingerprint card in
 
 Thomas
 
 contained “no reference to the charge of any offense” and merely showed a date in the “DATE ARRESTED OR RECEIVED.” 824 So.2d at 19. In this case, however, a charge is listed on the fingerprint card, and, in addition to the date entered in the box entitled “DATE ARRESTED OR RECEIVED,” the box entitled “DATE OF OFFENSE” is completed. Further, there is no argument by the State that, in this case, there was testimony regarding any previous illegal activities in which Belisle may have been involved.
 

 We conclude that this case is distinguishable from
 
 Thomas
 
 and
 
 Maples v. State,
 
 758 So.2d 1 (Ala.Crim.App.1999)
 
 (see
 
 note 13), we also conclude that it is distinguishable from
 
 Ex parte Johnson.
 
 As the State notes, the fingerprint card in this case was admitted as an exhibit along with “several other documents — a time card, a two-page letter to the Alabama Public Safety Department, a fingerprint-examination request form, and a copy of a fingerprint card for Annette ....,” with little testimony regarding the exhibit and apparently no specific mention of Belisle’s fingerprint card.
 
 Belisle,
 
 11 So.3d at 289. The fingerprint card in
 
 Ex parte Johnson
 
 was admitted as a separate exhibit and was accompanied by extensive testimony. 507 So.2d at 1341, rev’d,
 
 Ex parte Johnson,
 
 supra (discussing the testimony of at least two witnesses who testified regarding the defendant’s fingerprints and the fingerprint card).
 

 The information found on Belisle’s fingerprint card further distinguishes this case from
 
 Ex parte Johnson.
 
 Unlike Johnson’s fingerprint card, Belisle’s fingerprint card does not contain an alias. Even though it is unclear whether the reverse of Johnson’s fingerprint card (which contained the list of prior arrests) was admitted at his trial, the front of the card contained “a series of police numbers and an FBI number” that “clearly revealed the defendant’s past contacts with law enforcement agencies.” 507 So.2d at 1357. Here, Belisle’s fingerprint card contains only one charge, and a date of offense that coincides with the “DATE ARRESTED OR RECEIVED.”
 
 Ex parte Johnson
 
 is therefore distinguishable from this case. Moreover, the other caselaw cited by Belisle does not support a reversal of his conviction and sentence. Thus, the Court of Criminal Appeals did not err by determining that the admission of the fingerprint card was harmless error.
 

 D.
 
 Does Alabama’s method of execution constitute cruel and unusual punishment in violation of the Eighth Amendment?
 

 Belisle argues that “Alabama’s method of execution constitutes cruel and unusual punishment in violation of the Eight Amendment.”
 
 [14]
 
 Petition at 158; Belisle’s brief at 29.
 

 
 *338
 
 In Alabama, lethal injection is the method of execution of a death sentence unless the inmate chooses electrocution.
 
 See
 
 § 15-18-82(a), Ala.Code 1975 (“Where the sentence of death is pronounced against a convict, the sentence shall be executed ... as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law.”).
 

 Belisle notes that “Alabama’s lethal injection execution procedure, which is similar to the procedure typically used by lethal injection states, proscribes the sequential administration of sodium thio-pental for anaesthesia, pancuronium bromide or Pavulon to induce paralysis, and potassium chloride.” Belisle’s brief at 30. He contends, however, that evidence indicates that “the three-drug protocol creates an unnecessary risk of agonizing pain.”
 
 Id.
 
 The risk of unnecessary pain and suffering arises, says Belisle, “if the sedative effect of the sodium thiopental is ineffective and the inmate has retained or regained conscious[ness]” when the State administers the final two drugs to induce paralysis and death.
 
 [15]
 
 Belisle’s brief at 31. Belisle argues that “the State of Alabama has taken none of the steps necessary to safeguard against unnecessary pain and suffering.” Belisle’s brief at 30. Specifically, Belisle contends that the method employed by Alabama to check an inmate’s level of consciousness after the administration of the first drug- — sodium thiopental- — is insufficient. Belisle’s brief at 37-38.
 

 The State argues that “Alabama’s execution protocol is designed to minimize pain and is not inherently cruel and unusual.” State’s brief at 47. It notes that “Alabama eliminates the risk of unnecessary pain by using 2.5 grams of sodium thiopental— itself a lethal dose — to sufficiently anesthetize the inmate.” State’s brief at 52-53. The State notes that “[a]s an additional safeguard to ensure that the inmate is properly anesthetized, the Department of Corrections recently modified the execution protocol to add a consciousness assessment.” These additional safeguards include
 

 “(1) examination of the prisoner by an execution team member, following administration of the sodium [thiopental] but before administration of the pancu-ronium bromide, to assess his consciousness (by calling his name, gently stroking his eyelashes, and pinching his arm); and (2) administration of a second dosage of sodium [thiopental] if the preceding examination reveals consciousness.”
 

 Arthur v. Allen
 
 (Civil Action 07-0722-WS-M, Nov. 15, 2007) (S.D.Ala.2007) (not published in F.Supp.2d). Thus, the State contends that Alabama’s lethal-injection procedures do not constitute cruel and unusual punishment.
 

 The Eighth Amendment to the United States Constitution provides: “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” “Punishments are cruel when they involve torture or a lingering death; but the punishment of
 
 *339
 
 death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous,- — -something more than the mere extinguishment of life.”
 
 In re Kemmler,
 
 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in
 
 Baze v. Rees,
 
 — U.S. -, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
 

 “Our cases recognize that subjecting individuals to a risk of future harm — not simply actually inflicting pain — can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be
 
 ‘sure or very likely
 
 to cause serious illness and needless suffering,’ and give rise to ‘sufficiently
 
 imminent
 
 dangers.’
 
 Helling v. McKinney,
 
 509 U.S. 25, 33, 34-35 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk of harm’ that prevents prison officials from pleading that they were ‘subjectively blameless for purposes of the Eighth Amendment.’
 
 Farmer v. Brennan,
 
 511 U.S. 825, 842, 846, and n. 9 (1994).”
 

 - U.S. at -, 128 S.Ct. at 1530-31.
 

 In
 
 Baze,
 
 two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing “that there is a significant risk that the procedures will not be properly followed- — -in particular, that the sodium thiopental will not be properly administered to achieve its intended effect — - resulting in severe pain when the other chemicals are administered.” — U.S. at -, 128 S.Ct. at 1530. Belisle’s claim, like the claims made by the inmates in
 
 Baze,
 
 “hinges on the improper administration of the first drug, sodium thiopental.”
 
 Baze,
 
 — U.S. at -, 128 S.Ct. at 1533.
 

 The Supreme Court upheld the constitutionality of Kentucky’s method of execution,
 
 Baze,
 
 — U.S. at -, 128 S.Ct. at 1538, and noted that “[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.”
 
 Baze,
 
 — U.S. at -, 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.”
 
 Baze,
 
 — U.S. at -, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.”
 
 Baze,
 
 — U.S. at -, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
 

 The State argues, and we agree, that Belisle, like the inmates in
 
 Baze,
 
 cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.”
 
 Baze,
 
 — U.S. at -, 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.
 

 Conclusion
 

 For the foregoing reasons, we hold that the decision of the Court of Criminal Appeals does not conflict
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31
 
 *340
 
 L.Ed.2d 104 (1972),
 
 Cochran v. Ward,
 
 935 So.2d 1169 (Ala.2006), or
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986), and that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment.
 

 AFFIRMED.
 

 LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
 

 MURDOCK, J., concurs in the result.
 

 COBB, C.J., recuses herself.
 

 [1]
 

 . A more complete rendition of the facts relating to the murder are found in the Court of Criminal Appeals’ opinion.
 
 Belisle v. State,
 
 11 So.3d at 268-71.
 

 [2]
 

 . Annette and Belisle were indicted on two counts: murder during the course of a robbery,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975, and murder during the course of a burglary,
 
 see
 
 § 13A-5-40(a)(4), Ala.Code 1975.
 

 *
 

 Note from reporter of decisions: The Court of Criminal Appeals spelled this witness’s name
 
 "Valeire
 
 Wheeler.”
 

 [3]
 

 . In
 
 Brady,
 
 373 U.S. at 87, 83 S.Ct. 1194, the United States Supreme Court held that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.”
 

 [4]
 

 .
 
 See also Ex parte Brown,
 
 548 So.2d 993, 994 (Ala.1989) ("This Court has held in
 
 Ex parte Kennedy,
 
 472 So.2d 1106 (Ala.1985), cert. den.,
 
 Kennedy v. Alabama,
 
 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985), that a defendant must demonstrate, first, that the State suppressed the evidence, and, second, that the evidence suppressed was favorable to the defendant or exculpatory, and, finally, that the evidence was material.”).
 

 [5]
 

 . It appears that the State believed that the proffer had in fact been turned over to the defense. ("[District attorney:] When I received this file, I saw this proffer, saw the case number. I think, on record, I'll say as we were walking out, I thought it was made part of the court file. It was executed. So if it was not provided — I admit I have not provided it. It was a complete oversight. I assumed that [the defense] had it.”).
 

 [6]
 

 . The trial court entered its discovery order on October 26, 2001.
 

 [7]
 

 . Section II, paragraph 3, of the trial court’s discovery order states “[pjursuant to Rule 16.3 of the Alabama Rules of Criminal Procedure, each request is continuing in nature and additional responsive information should be revealed as soon as it occurs.”
 

 [8]
 

 . Rule 16.3, Ala. R.Crim. P., provides:
 

 "If prior to or during trial a party discovers additional evidence or decides to use additional evidence, which evidence has been subject to discovery under this rule, that party shall promptly notify the court and the opposing party of the existence of the additional evidence.”
 

 [9]
 

 .
 
 See also United States v. Agurs,
 
 427 U.S. 97, 112-13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.” (footnote omitted)).
 

 [10]
 

 .
 
 See also Agurs,
 
 427 U.S. at 112 n. 20, 96 S.Ct. 2392 ("It has been argued that the standard should focus on the impact of the undisclosed evidence on the defendant's ability to
 
 *332
 
 prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence. Such a standard would be unacceptable for determining the materiality of what has been generally recognized as
 
 ‘Brady
 
 material' for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentia-ry support for the charge.”).
 

 [11]
 

 . Belisle also argues:
 

 "The lower court found that the fact that this evidence [the proffer] came out before the close of trial, allowing defense counsel an opportunity to cross-examine Annette about it, rendered this error harmless. This is wrong for several reasons.”
 

 Petition at 13. In support of this argument Belisle cites
 
 Ex parte Williams,
 
 642 So.2d 391, 393 (Ala.1993),
 
 Ex parte Grandberry,
 
 640 So.2d 919 (Ala.1993),
 
 Ex parte Brown,
 
 548 So.2d 993 (Ala.1989), and
 
 Padgett v. State,
 
 668 So.2d 78 (Ala.Crim.App.1995). However, as explained above, our conclusion that the tardy disclosure of the proffer is not reversible error is not premised solely on the fact that the proffer was eventually disclosed to Belisle and that Belisle was able to cross-examine Annette using the proffer. Instead, as noted above, Belisle had many other components of that proffer by which he could similarly impeach Annette, in addition to getting the opportunity to cross-examine Annette on the proffer and to admit the proffer into evidence.
 

 [12]
 

 . It appears that the following colloquy is the only mention of the admitted fingerprint card during trial:
 

 "Q. [Prosecution]: I'm going to show you what has been marked as State’s Exhibit 82. What’s in State’s Exhibit 82?
 

 "A. [Detective Turner]: The time card of Joyce Moore at [the T & J Kwik-Mart convenience store], some fingerprint cards, and a letter from DFS, Department of Forensic Science.
 

 "Q. So they tried to match fingerprints to that time card, didn’t they?
 

 “A. Yes, sir.
 

 "Q. And they didn’t find any fingerprints belonging to Rick Belisle, did they?
 

 "A. No, sir."
 

 [13]
 

 . The State also cites
 
 Maples v. State,
 
 758 So.2d 1, 61-62 (Ala.Crim.App.1999). However,
 
 Maples
 
 is clearly distinguishable from this case because, in
 
 Maples,
 
 "[t]he redacted copy of the fingerprint card did not contain any reference to the appellant's prior arrest record. The offenses involved and the headings ‘Date Arrested’ and ‘Date of Offense’ were deleted from the copy of the fingerprint card.” 758 So.2d at 62.
 

 [14]
 

 . Belisle has not argued, and we do not address, whether Alabama's form of execution
 
 *338
 
 constitutes cruel and unusual punishment under Alabama's Constitution.
 
 See
 
 Art. I, § 15 ("That excessive fines shall not be imposed, nor cruel or unusual punishment inflicted.").
 

 [15]
 

 .
 
 See Harbison v. Little, 511
 
 F.Supp.2d 872, 883 (M.D.Tenn.2007) ("It is undisputed that, without proper anaesthesia, the administration of pancuronium bromide and potassium chloride, either separately or in combination, would result in a terrifying, excruciating death. The basic mechanics are that the inmate would first be paralyzed and suffocated (because the paralysis would make him unable to draw breath), then feel a burning pain throughout his body, and then suffer a heart attack while remaining unable to breathe.”).